70 So.2d 755 (1954)
PEAVY
v.
CALCASIEU PAPER CO., Inc.
No. 3785.
Court of Appeal of Louisiana, First Circuit.
January 29, 1954.
Rehearing Denied March 22, 1954.
Lawes, Hickman & Brame, Lake Charles, for appellant.
Wood & Jackson, Leesville, for appellee.
LE COMPTE, Judge ad Hoc.
This is a suit for workmen's compensation in which plaintiff claims total and permanent disability. After trial there was judgment in favor of the plaintiff awarding compensation in the amount of $30 per week not to exceed 300 weeks, less the amounts paid. Defendant has appealed from the judgment and plaintiff has answered the appeal asking that the judgment be amended to increase the maximum period of compensation to 400 weeks.
Plaintiff was employed by defendant as a fireman's helper at its paper mill in Allen Parish, Louisiana. The employment and *756 the hazardous nature of the work are admitted by the defendant. Plaintiff alleged in Article 4 of his petition that on or about August 17, 1951, while performing services arising out of his employment, he accidentally slipped and fell on a board walk, with great force, and severely and permanently injured himself. The answer of the defendant to that article of the petition sets out that "Except to admit that on the date set forth in Article 4 of the petition, plaintiff while in the employ of the defendant as a laborer sustained a minor injury from which he has completely recovered, the allegations contained in Article 4 of plaintiff's petition are denied." In view of that admission and the other corroborating evidence in the record, this Court is convinced that plaintiff did sustain an accidental injury on August 17, 1951.
At the time of the injury, plaintiff was receiving an hourly wage of $1.05 and worked eight hours per day, or a wage scale of $8.40 per day. He worked on shift work and he testified that he would work for seven consecutive days before getting a day off. His testimony was not contradicted. On that basis, plaintiff would be entitled to the maximum compensation of $30 per week if he is disabled. Defendant contended that plaintiff's average weekly pay was $45.15, but it offered no evidence in support of this and it makes no mention of this issue in its brief. Defendant paid plaintiff compensation at the rate of $29.35 per week from the date of the accident until the last of December, 1951.
Defendant's contentions before this Court are (1) that plaintiff was not disabled to an extent that he was prevented from continuing his regular job; alternatively (2) if plaintiff was disabled, such disability arose from a pre-existing arthritic condition of his back, which was not aggravated by any event while in the employment of defendant, and that plaintiff withheld from defendant information as to his pre-existing back condition; and (3) if plaintiff was disabled from continuing at his work and if the cause of his disability is an accident sustained during the course of his employment, that this disability is neither total nor permanent. These contentions will be taken up in the order in which they are stated.
The parties are in disagreement as to the exact duties of the plaintiff in connection with his regular job. The injury on which this suit is based occurred on August 17, 1951, in Allen Parish, at which time plaintiff was employed by the defendant as a fireman's helper, working with the boilers and furnaces of the paper mill of the Calcasieu Paper Company, Inc., defendant, at Elizabeth, Louisiana. In describing his duties, plaintiff testified that "the first thing we did we blew the cinders out of the boiler, then we raked the clinkers, broke those down and raked them. When we raked those down they were hot and we rolled them out approximately fifty yards with a wheelbarrow. Eight to twenty loads per eight hour shift. Then we took our water test, climbing stairs, three stairs (flights of stairs) up to the turbine." One of these stairs was a vertical ladder about 8 to 12 feet tall. The tool used to clean the clinkers from the furnaces was described by plaintiff as weighing 40 pounds and being 16 feet long. In addition, it was the duty of the fireman's helper to carry a five gallon can with from three to five gallons of chemicals in it to the exception pond outside the boiler room. In cleaning up plaintiff used a broom and shovel to clean the second floor and on the bottom floor they used a 3-inch high pressure water hose and then a broom to sweep the water off the floor. Defendant, however, contends that such were not the duties of the plaintiff, that his job as fireman's helper did not involve heavy manual labor and that, in the main, his duties were to run boiler water tests, which consisted of taking water from the boiler and letting it evaporate in a condenser, firing the boilers, which were run by gas, involving only the turning of a valve, and making his rounds of the water wells three times during an eight-hour shift. L. J. East, steam and fire superintendent for the defendant, in describing the duties of the plaintiff, testified that "the heaviest thing a man would have to pick up isa gallon-bucket of copper sulphate, andit's *757 very light." However, E. W. Sirman, operating engineer for the defendant, testified that the chemicals carried by the plaintiff weighed about ten pounds. Sirman testified further that as a fireman's helper, plaintiff's duties were to run boiler water tests, firing the boilers, which were run by gas, involving very little manual effort, and that the plaintiff had to make his rounds of the water wells about three times a day during an eight-hour shift.
The evidence shows that on each shift the defendant employs two fireman's helpers, one a Negro and the other a white man. Plaintiff, being the white man, always worked along with another fireman's helper who was a Negro and who usually was a Negro by the name of William Scott. It is defendant's contention that all of the manual labor described as having been done by the plaintiff were the duties of the Negro fireman's helper, Scott, and that the plaintiff was not supposed to do any of that manual labor. However, none of the witnesses of the defendant on that point denied that plaintiff actually shared in the manual labor and actually performed the work which he described, that this was known to the defendant, and that, in the doing of that work, plaintiff was not violating any of the company rules. The gist of the testimony of defendant's witnesses on this point is that although plaintiff did these things, it was purely voluntary on his part, that this work was not a part of his duties and that he could have held his job as fireman's helper without engaging in this manual labor.
Plaintiff subpoenaed the log book of the defendant which contains daily entries of the work performed by the employees in the power plant. This log book is in evidence as Exhibits P-20 and P-21. On the date of May 12, 1951, covering the shift from 7:00 o'clock a. m., to 3:00 o'clock p. m., the following entry was made "Peavy (plaintiff) and Scott (Negro) cleaned #5 bark furnace and #5 gas furnace. 1st and 2nd dust cellar 8:30 A.M., #4 bark furnace 9:00 A.M. Put 4 gal. chemical in new pond. Wells & ponds o.k. 1 P.M. cleaned 1st & 2nd dust cellar again 1:15 P.M."
Similar entries appear in that log book for almost every day on which the plaintiff worked prior to the time of the accident.
Considering the evidence as a whole and the corroboration of plaintiff's testimony by the daily entries in the log book, it is the opinion of this Court that the plaintiff, who was classified as a fireman's helper, which classification was also held by his co-worker Scott, was required to perform the same duties as his co-worker, the performance of which was fully known to the defendant, and that the plaintiff's job as a fireman's helper required him to do heavy manual labor. Because of the conclusions reached hereafter as to plaintiff's disability at the time of the trial, it is also the court's opinion that he could not perform the regular duties of his employment.
In connection with the second contention of the defendant, the evidence is undisputed that plaintiff sustained a back injury while working for Corrigan Lumber Company near Cleveland, Texas, about September 15, 1948. According to the physician who examined him on September 25, 1948, for that injury, the clinical history is that the plaintiff was driving a lumber carrier when he got a catch-like pain in his back and his legs felt a little paralyzed. It is also established by the evidence that at the time the plaintiff went to work for the defendant, he concealed that injury, as appears from his pre-employment examination made by Dr. Saint. For the 1948 injury plaintiff was paid compensation aggregating $875. He was first paid $375, but later employed an attorney to reopen the case, resulting in the payment of an additional $500. In connection with the 1948 injury, the plaintiff was examined or treated by Dr. I. S. McReynolds, an Orthopedic Surgeon, of Houston, Texas, Dr. Claude Pollard, Jr., a Neurosurgeon, of Houston, Texas, and by Dr. G. W. N. Eggers, an Orthopedic Surgeon, of Galveston, Texas.
Dr. Eggers examined the plaintiff on June 29, 1949, in connection with the 1948 injury and he also examined him in March of 1952, in connection with the 1951 injury. He testified that the complaints which the *758 plaintiff made to him in March, 1952, were basically the same as the complaints in June of 1949. His conclusion was that at the time of the 1948 injury, plaintiff did not have a ruptured intervertebral disc, but that his condition was due to the arthritic changes in the vertebra accompanied with some anticipative psychiatric attitude.
Dr. Pollard, who examined the plaintiff on September 30, 1948, testified that it was his conclusion that as of that date, plainiff probably was suffering from a ruptured intervertebral disc. He testified that once a disc injury had occurred, recurrent attacks practically always take place with or without additional injury.
Dr. I. S. McReynolds testified that he examined the plaintiff on September 25, 1948, and on October 8, 1948, in connection with the 1948 injury. At that time, and after having made a myelographic study of plaintiff's back, he concluded that Peavy was not suffering from a ruptured disc, that the disability of 1948 was not too serious and that he felt that the plaintiff would recover to the point where he could go back to his regular work. These three doctors were in agreement, however, that plaintiff's back was not a normal back and that it might be classified as a weak back.
To refute the defendant's evidence that his present disability was due to the injury of 1948 and to show that he had recovered from that injury and was doing heavy manual labor, plaintiff called Charles Chaney, Foreman for the Industrial Lumber Company, who testified that plaintiff had worked under his immediate supervision for approximately two weeks in 1950. During that time, he worked planting trees, carrying a digging instrument weighing approximately ten pounds and a bucket of seedlings, and planted the pine seedlings. The evidence shows that plaintiff did this work well and never complained. A co-worker in that operation, Archie Durant, testified to the same effect. It was also shown that during 1950, plaintiff worked as a mechanic at the Elizabeth Motor Company. John McDaniel, a witness for the plaintiff, testified that he worked with the plaintiff on this job and that this work required lifting, straining and crawling under and on top of cars and that the plaintiff did this work satisfactorily and never complained. William Chase, another mechanic employed by the same things. Plaintiff worked for Elizabeth Motor Company some three or four months. The evidence also shows that on his job with the defendant, the plaintiff performed much manual labor and did his work satisfactorily until August 17, 1951, when he was injured. It is true that there is some evidence that plaintiff was off for several days in March, May, June and July, 1951, but these absences are largely accounted for by the fact that plaintiff, during those absences, was having his teeth extracted at the recommendation of Dr. Saint.
From the evidence in this record, it is the opinion of this Court that the 1948 injury of the plaintiff was not of too serious a nature; that, since the 1948 injury the plaintiff has worked on several jobs requiring heavy manual labor, which work he performed satisfactorily, and that, therefore, he had recovered from that injury prior to the injury of August 17, 1951. The trial court so found and this court concurs in that finding.
We now come to a consideration of the extent of the plaintiff's disability at the time of the trial. Plaintiff testified that he was injured on the morning of August 17, 1951, at about 2:30 a. m., when he went out on his routine water well checks; that there was a plank walk up to the side of well No. 6, on which water had been leaking for some time and that the surface was slick; that the lights were out and that when he stepped on this catwalk, both of his legs went out from under him and his body struck the edge of the planks of the catwalk. He continued to work for two or three days in pain but he did not go to a doctor until August 22, 1951, and on that date he was examined by Dr. C. L. Saint, of Elizabeth, Louisiana, who was the regularly retained physician of the defendant. Dr. Saint made X-rays of the plaintiff *759 and in his first report of the accident he diagnosed plaintiff's injury as "Contusion of sacral regions with incomplete fracture proximal bone of coccyx; impaired sensation right-left extremity." Dr. Saint treated plaintiff for about six weeks at the end of which period plaintiff went back to work for some two or three days, but because of continued pain, he had to abandon his work and he returned to Dr. Saint for further treatment. Dr. Saint then referred Peavy's case to Dr. T. E. Banks of Alexandria, Louisiana, an Orthopedic Surgeon. Dr. Banks examined plaintiff on October 24, November 1, and November 15, 1951. He examined the X-rays that Dr. Saint had taken and took additional X-rays. At the conclusion of the first examination, Dr. Banks found some evidence of a relatively mild back strain. He felt, however, that the plaintiff was exaggerating his complaints. Dr. Banks fitted plaintiff with a Zimmer Back Support, which plaintiff was still wearing at the time of the trial. Dr. Banks testified that he did not believe that the plaintiff was a malingerer but, at the conclusion of the examination on November 15th, he felt that plaintiff was not sufficiently injured to prevent him from doing light work. Contrary to the findings of Dr. Saint, Dr. Banks testified that plaintiff did not have a fracture of the coccyx bone.
Plaintiff produced as his witnesses, Dr. William E. Reid, of Leesville, Louisiana, Dr. George P. Schneider, Jr., of Lake Charles, Louisiana, and Dr. E. H. Byrd, of Leesville, Louisiana. Dr. Byrd testified that he examined the plaintiff on April 16, 1952, and again on July 23, 1952, which was the last examination given to the plaintiff prior to the trial. He found muscular spasms in the lower back area, tenderness in the muscles in the third, fourth and fifth low lumbar area, limitation of lateral rotation in both directions and limitation in forward bending. He concluded that as of July 23, 1952, plaintiff was totally disabled for hard work. He testified, however, that plaintiff would probably recover in one to one and one-half years but that he would probably have a twenty-five (25%) per cent disability after that time.
Dr. Schneider and Dr. Reid examined plaintiff at the Charity Hospital in Shreveport, on January 26, 1952. Their testimony is, in the main, in agreement with the findings of Dr. E. H. Byrd in that both of them found muscle spasms in the lower back area and tenderness in the low lumbar area. They also stated that there was limited lateral rotation in both directions. Dr. Reid testified that, at the time of the examination, it was his opinion that the plaintiff was unable to do work of any reasonable character, that it would be many months before plaintiff would have maximum recovery, and after maximum recovery, plaintiff would have about 25% disability. Dr. Schneider testified that the period of plaintiff's disability was indefinite and that he could not estimate when recovery might be expected.
The jurisprudence is clear that where a claimant is shown to be totally disabled at the time of the trial and there is no evidence on which to fix a definite period for the duration of the disability, compensation should be awarded for the maximum number of weeks, since the defendant is protected by the provisions in the law which permit a review of the judgment at intervals of six months. Woodward v. Blair, La.App., 197 So. 920; Vilce v. Travelers Ins. Co., La.App., 24 So.2d 485; Strother v. Standard Acc. Ins. Co., La.App., 63 So.2d 484. The District Court allowed plaintiff compensation during the period of disability not to exceed 300 weeks. However, in view of the evidence, it is the opinion of this Court that the maximum period should be increased to 400 weeks.
For the foregoing reasons, it is ordered that the judgment appealed from be amended by granting compensation at the rate of $30 per week during plaintiff's disability for a period not to exceed 400 weeks, subject to credit for compensation previously paid, and that as thus amended the judgment be affirmed at appellant's cost.
CAVANAUGH, J., recused.