AYRES, Judge.
This is a suit for compensation on account of disabling injuries allegedly sustained in an accident of June 23, 19S4, while plaintiff was in the employ of the defendant City of Monroe. Alleging that said injuries resulted in his total and permanent disability, plaintiff claims compensation in the sum of $23.08 per week for the period of his disability, not exceeding 400 weeks, less compensation for 21 weeks previously paid, and for the maximum medical expense, together with penalties and attorney’s fee.
From a judgment in plaintiff’s favor for the aforesaid weekly sum during the period of his disability and not extending beyond 300 weeks as for total temporary disability, less compensation previously paid not only for the aforesaid 21 weeks but also for 11 weeks additional, calculated from the excess payments made during the aforesaid 21 weeks and ordered credited at the end of the aforesaid maximum period, and further reserving unto plaintiff the maximum $1,000 for medical expense, less $271.95 previously incurred by defendant on plaintiff’s behalf, defendant has appealed.
Plaintiff likewise devolutively appealed and has made a further appearance by answering defendant’s appeal, praying that he be awarded compensation as for permanent, total disability and for the duration thereof, not exceeding, however, 400 weeks, less 21 weeks during which wages were paid in lieu of compensation. Plaintiff’s demands for penalties and attorney’s fees were not urged either in brief or by argument before this court. These demands *261 were apparently abandoned in the trial court and will accordingly be so treated here.
Plaintiff was employed as a common laborer by the City of Monroe. His employment was in connection with the construction and repair of its streets, sewers, and other public improvements. While so employed on June 23, 1954, with other employees, he was engaged in delivering and unloading concrete meter boxes for water lines to be installed and used in connection with the municipal water system. These boxes varied in size and weight according to the size of the lines upon which they were to be connected. There were three sizes, the largest ones weighing as much as three to four hundred pounds. Plaintiff and a fellow employee by the name of William Mecom were unloading one of these boxes from the truck upon which they had been transported to the delivery site, when plaintiff stepped and slipped on rocks or pebbles in the street, which, from the weight he was carrying, produced a severe strain upon his back, resulting in the injuries of which he complains. As his back strained there was a “snap” or “pop” in his back, followed immediately by a painful and burning sensation, and, according to his testimony, he then and there informed Mecom that he had hurt his back. Notwithstanding this, however, plaintiff continued his work and assisted in unloading several other meter boxes and remained on the job until the conclusion of the work day at 5 :00 o’clock. Pie, as well as the other employees, was transported to the defendant’s barn and from there they were transported to their residences.
Plaintiff made no complaint to any of the other employees during the afternoon while at work or on the truck to the barn or to his residence to the effect that he had sustained an accident and was injured thereby. Plaintiff’s wife was visiting in Jena, Louisi-an, but his married daughter, a Mrs. Jackson, was at his residence, and, after she prepared plaintiff’s supper, he refused to eat and complained of his back, telling her of the injury that he had suffered during the day. All during the night he complained of pain and on the next morning sent word to his foreman that, due to his injury, he was unable to work. He was advised by his superior, an employee of the defendant, to report to Dr. Fred Marx. Plaintiff complied with this instruction and called at the office of Dr. Marx on the day following his injury, and on the following day, June 25, 1954, he was, on Dr. Marx’ advice and instructions, admitted to the St. Francis Sanitarium, where he was treated by Dr. Marx daily until July 3, 1954, at which time he was released and permitted to return to his residence. On the day of his admission to the hospital, Dr. F. Cannon, an orthopedist, at the suggestion of Dr. Marx, also examined plaintiff.
During the next three months Dr. Marx attended plaintiff professionally upon 24 occasions. Dr. Cannon made further examinations on July 16 and August 20, 1954. Dr. Lobrano assisted in the examinations by making X-rays on two occasions, that is, on June 25 and June 28, 1954. During the following September Dr. Marx, evidently suspecting that plaintiff was suffering a herniated disc or other involvement of the spinal column, advised that plaintiff submit to a myelogram, which requires a puncture of the spinal column and the injection of a fluid around the spinal cord. Also, at Dr. Marx’ request, plaintiff was examined by Dr. A. Scott Hamilton, another orthopedist, who made two examinations, the first on September 20, 1954, and again on January 17, 1955. Plaintiff refused the myelogram test and did not return for treatment by Dr. Marx after October 11, 1954. Whereupon Dr. Marx discharged him and the defendant accordingly discontinued the payment of his wages, which had been paid from the date of the accident to November 19, 1954, or for a period of 21 weeks.
The defendant denied that plaintiff was involved in an accident while in its employ and averred that in the event he was experiencing any disability it was not the result of any accident while in its employ *262 but was due to an old injury received in an accident in 1939 while he was in the employ of another. Additionally, it was claimed that if plaintiff did sustain an accident and disabling injuries therefrom, such disability could not have exceeded 12 weeks, during which time plaintiff was paid full wages.
 The first issue presented for determination involves questions of fact. They may be stated:
Was plaintiff involved in an accident? Did he sustain accidental injuries thereby, and, if so, what disabilities did he suffer, and the extent and duration thereof?
These questions were resolved by the trial court in plaintiff’s favor. His Honor’s findings and conclusions find support in the evidence in the record. A careful review and examination of the record discloses no manifest error therein. In summarizing the facts and in reaching its conclusions, the court stated:
“The testimony of the plaintiff relative to the accident was that on June 23, 1954 that he was digging ditches and hauling meter boxes with a crew of fellow employees. The meter boxes were made of concrete; and weighed around 300 or 350 pounds; that there were six men in the crew including his foreman, Mr. Jim Garner; that about 2:30 p. m. the foreman, Mr. Jim Garner was some distance from the truck; that all the members of the crew, with the exception of the plaintiff and William Mecom, were working across the street; that a man by the name of Thompson also working for the City, bpt not a member of the plaintiff’s crew was working on the same side of the street as the plaintiff and nearby; that as the plaintiff and Mecom unloaded the third meter box, the plaintiff’s foot slipped on a pebble causing a strain on his back; that he told Mecom that he had hurt his back and that he had heard a popping and felt a burning sensation in his back. The plaintiff further testified that he and Mecom unloaded five more meter boxes after he hurt his back; that he continued to work until approximately 4:30 p. m. when they quit work. The members of the crew were loaded on the truck and carried to the barn. From there the plaintiff and Pete Shambro were carried to their home by Jim Garner in the truck.
“Mrs. Jackson, daughter of the plaintiff, stated that she was at the plaintiff’s home when he arrived; that the plaintiff’s wife was out of town visiting her sister in Jena, Louisiana. Mrs. Jackson further stated that she prepared supper for her father and that he refused to eat and when she asked him what was wrong, he stated that his back was hurting and when asked how he hurt it that he said something about a box and that she tried to get him to go to a doctor or call one but that the plaintiff said he thought it might pass off and would not call a doctor; that the plaintiff complained all night long and was unable to go to work the next morning. The next morning, which was June 24, 1954, the plaintiff sent word to his foreman, Mr. J. B. Renaud, that he had gotten hurt and the foreman came by plaintiff’s home and advised him to report to Dr. Marx, which he did.
“Dr. Marx testified that upon examination of the plaintiff that there was muscle spasm of the muscles along each side of the spine from approximately the level of the first lumbar vertebra through the fifth lumbar vertebra of a moderate degree. The most minor degree of palpation produced a remarkable response in the form of a pulling away or complaint on the part of the plaintiff. Cough produced pain in the region of the fourth or fifth lumbar vertebra and straight leg raising also produced pain. The next day the doctor sent the plaintiff to the St. Francis Sanitarium, where the plaintiff remained until July 3rd. Treatment consisted of bed rest on a boarded *263 bed, medicine to relax the -muscle spasm and narcotics to alleviate the pain. Plaintiff was also put in pelvic traction. X-rays were made by Dr. Lobrano, roentgenologist and revealed no fracture or dislocation. Dr. Marx testified that in his opinion the plaintiff received a sprain or strain, possibly even a ruptured disc.
“Dr. F. Cannon, orthopedist, examined the plaintiff at the St. Francis Sanitarium on June 26, 1954. He concluded upon his examination that the patient had sustained trauma which was superimposed upon a congenital or pre-existing defect in his inferior articular processes of the fifth lumbar vertebra and the doctor also detected definite spasm involving the sacral-spinalis group of muscles to either side of his lumbar spine. The doctor stated that it was his opinion that the plaintiff’s disability was based primarily upon either the ligementous or muscular strain with respect to the lumbo sacral area. The doctor stated further that he found no evidence of any herniated disc.
“Dr. A. Scott Hamilton examined the pl-aintiff on September 20, 1954. The doctor found that upon his examination that the plaintiff had a first degree spondylolisthesis. The doctor stated it was possible that this condition was aggravated to some extent by his injury.
“Dr. Frank Rizzo examined the plaintiff on January 24, 1955. He stated that the plaintiff could possibly have a ruptured disc pressing on some of his nerves causing sciatica. Upon being asked:
“Q. ‘Well, in unloading one of those boxes, two men, could a man receive a strain or injury of some character, to his back? A. Well, yes, sir. It is less likely for a man to hurt himself handling heavy boxes or any heavy object if everything is going well. He is accustomed to it and knows how to handle himself. It is very unlikely for a man to hurt him,self doing straining work per se. By ■the way that he gave the history to me that he stepped on a rock or something, that he twisted his ankle, naturally causing him to give suddenly and the weight was suddenly thrown on him when he wasn’t really prepared for it that way, that is more likely to do it. You can get a severe injury .to the back actually believe it or not from just stooping down tying a shoe string than you can from actually lifting heavy objects.’
“Therefore, the plaintiff relates in detail the accident. His story is corroborated by that of his daughter who saw him some three hours later. He reported to his foreman the accident the next morning. Dr. Marx, Dr. Cannon, Dr. Hamilton and Dr. Rizzo all stated that it could have happened as he said and all found that the plaintiff was disabled. The only other testimony to the contrary was the testimony of the members of the crew with whom the plaintiff worked, that he at no time that afternoon confided with them that he had received an injury. The only person that the plaintiff told that he had received an injury was William Mecom, who was lifting the other end of the meter box and the plaintiff’s testimony was that Mecom was somewhere in Texas and whose address he did not know and, therefore, was not available to testify on the date of the trial. The testimony of the members of the crew, being negative in character, the Court is of the opinion that the plaintiff received an injury to his back on the afternoon of June 23, 1954. •
“As to the entent of his disability, Dr. Marx testified that he did not discharge plaintiff because he thought he had fully recovered but for the reason that the doctor had advised a myelogram and that the plaintiff had refused and had not come back to Dr. Marx for further treatment. Dr. Marx stated that the last time that *264 he examined the plaintiff which was in September, that he felt disability should have probably terminated within a period of four to six months following the date of injury; that as he had not examined the plaintiff since September, 1954, he would not be able to give an opinion as to the extent of his disability at the moment he testified but he felt that by that time — that is the time' 'of trial — that the plaintiff should be completely free of disability.
"Dr.. F. Cannon stated that upon his first examination that he felt like the patient would require probably three or four months of convalescent time and felt that there was no reason why he should not have a complete recovery from the effect of the injury. On July 16, 1954, the doctor examined him and stated that he felt like at that time that the plaintiff should recover in approximately three or four months from that time which would make approximately six months from the date of injury. The doctor examined him on August 20, 1954 and felt that at that time that the plaintiff would require the total of three or four months convalescent time from the date of injury and found no evidence of any permanent disability. The doctor did not examine the plaintiff after that date.
. “Dr.. A. Scott Hamilton examined the plaintiff first on September 20, 1954 and again on January 17, 1955. The doctor, upon being asked:
“Q. ‘Now ■ doctor, based on all of those tests in your examination what is your opinion as to Mr. Delouche’s complaints? A. I think as I said before, that he had a first degree spondy-lolisthesis. It is possible that this condition was aggravated to some extent by his injury, nevertheless with the amount of exaggeration, falsification, increased response, abnormal response, I can only feel that the aggravation of his spondylolisthesis is not too great in extent. I think he has some disability; I don’t think there is any doubt about it. I don’t think that the disability is as great as he feels it is.’
“The doctor stated further in response to the question as to whether or not the patient would be able to return to hard manual labor:
“Q. ‘Could you give an estimate as to when that might be — as to time ? A. In order to be absolutely fair and to bend over backwards I would say that twelve to eighteen months would be the time required.
“Q. Would that time date from the beginning of the injury? A. From the beginning of his condition, yes, sir.’
“Dr. Rizzo stated that he examined the plaintiff on January 24, 1955.
“Q. ‘Doctor, from your examination of him, Mr. Delouche, from his history and objective evidence, did you find that he had a disabling injury for the one engaged in manual labor? A. I think so at the present time he has.’
“So, therefore, the doctors are in agreement that the plaintiff was totally disabled from doing manual labor at the time of trial. The testimony revealed that the plaintiff had never done any other type of work other than hard manual labor. The plaintiff testified that at the time of trial that due to the injury to his back he was unable to lift anything; that he was unable to sleep without taking dope pills. His neighbor, Mr. A. W. Thompson, Sr., stated that he lived across the street from the plaintiff and the plaintiff had on one occasion since his accident tried to mow his yard but was unable to do so due to his disability.
“From the testimony given the Court must conclude that the plaintiff received an injury in the scope and course of his employment; that he was totally and permanently disabled because of the injury to do the type of work he was doing at the time of injury and *265 that he is still totally and permanently disabled for doing manual labor.”
On a rehearing the court concluded that it erred in two particulars, (1) in not granting to the defendant credit for over-payments in excess of the weekly compensation that the defendant had been paid since June 23, 1954, and (2) in granting to the plaintiff compensation for the maximum period of 400 weeks. With the conclusion reached on these two points we are unable to agree. We shall direct our attention to these issues in the reverse order.
Inasmuch as the conclusion reached by the trial -judge, as well as by us, is that plaintiff was totally and permanently disabled because of the injuries ' suffered in the accident sustained by him and was so totally and permanently disabled at the time of trial, and it appearing problematical under the evidence as to the duration of the disability, the interval for the payment of compensation should have been fixed as for the period of such disability, not exceeding 400 weeks.
Professor Malone in Louisiana Workmen’s Compensation Law and Practice 354, Sec. 280, says:
“If at the time of trial it appears that the injury will produce disability for an extended period, the court will not usually indulge in conjecture or attempt to fix definitely the number of weeks for which compensation shall be paid. In such cases, the award will be made for ‘the duration of the disability’, subject, of course, to the appropriate maximum. Whenever thereafter the disability ceases, the employer is authorized by the statute to apply for a modification of -the judgment. Thus he is fairly protected against imposition.”
See the authorities therein cited.
Our views herein are in.accord with the views of the First Circuit Court as expressed in Peavy v. Calcasieu Paper Co., Inc., La.App., 70 So.2d 755, 759, wherein the court stated:
“The jurisprudence is clear that where a claimant is shown to be totally disabled at the time of the trial and there is no evidence on which to fix a definite period for the duration of the disability, compensation should ' be awarded for the maximum number of weeks, since the defendant is protected ■by the provisions in the law which permit a review of the judgment at intervals of six months. Woodward v. Blair, La.App., 197 So. 920; Vilce v. Travelers Ins. Co., La.App., 24 So.2d 485; Strother v. Standard Acc. Ins. Co., La.App., 63 So.2d 484. The District Court allowed plaintiff compensation during the period of disability not to exceed 300 weeks. However, in view of the evidence, it is the opinion of this Court that the maximum period should be increased to 400 weeks.”
It was held in Strother v. Standard Acc. Ins. Co., La.App., 63 So.2d 484, that where the evidence was conflicting as to whether plaintiff’s disability was of a permanent or temporary nature and the court was unable to determine whether plaintiff would recover and, if so, when such' recovery might be expected, plaintiff was en-' titled to an award of compensation during the period prescribed for permanent, total disability. An award of compensation as for permanent and total disability and for a period of disability not exceeding 400 weeks, subject to payments previously made, was approved by this court in Wallace v. Spohrer-Pollard Contractors, 76 So.2d 312, wherein it was found that plaintiff was still disabled at the time of trial.
As to the first of these propositions we do not think the authorities cited by the lower court in support of its conclusion that plaintiff should be credited by the excess payment of wages over compensation payable to plaintiff by crediting such excess at the end of the term for which compensation is payable, namely, Thibeau v. Dutton & Mercer, 17 La.App. 338, 136 So. 186, and Hammons v. Mississippi Cottonseed Products Co., La.App., 160 So. 140, are controlling here or are in accord with the later *266 authorities and the established jurisprudence of this State.
It is firmly settled that where .an employee sustains compensable accidental injuries but is kept on the pay roll out of charity, and his wages are paid him solely as a gratuity, or as a benevolence, as was done in this case, and the wages, although not.earned, amounted each week to at least as much as the compensation would have been, credit :on the compensation is due on a week-to-week basis for each week such gratuitous payments are made. It is also well settled that if during any such week the employer or his insurer pays to the injured workman gratuitous wages amounting to more than the compensation would have been, credit is not to be given to the employer, or to his insurer, on the basis of the amount paid but the credit to be allowed is only one week in compensation in which the gratuitous wages paid him equal or exceed what the compensation would have been. Daigle v. Higgins Industries, Inc., La.App., 29 So.2d 374.
The first case presenting the question of credit to an employer for services paid a retained employee was Hulo v. City of New Iberia, 153 La. 284, 95 So. 719. The plaintiff there had been retained oh the pay roll following his accidental injury. After a period of recuperation he returned to work and performed lighter duties. For a time he was paid $90 per month, then later $45 per month, but the court found that he was only able to earn $30 per month and an award of permanent, partial disability was made on that basis. Concerning the wage payments in excess of $30 per month, it was held that where an employer has, out of sympathy and benevolence, and with a view to assist, paid an injured employee more than he is really earning, such excess payments should be taken into account as advance payments.
The general policy of recognizing wage payments has continued to receive support in later cases and the employer has been allowed credit in some form of other for wages paid during a time an injured employee is paid full wages for lighter work with a view of eventually re-establishing him at his old, or in a new, job; the employer, however, need not pay both wages and compensation. Becton v. Deas Paving Co., Inc., 3 La.App. 683; Hennen v. Louisiana Highway Commission, La.App., 178 So. 654; Holmes v. Armour & Co., La.App., 190 So. 865; Carlino v. United States Fidelity & Guaranty Co., 196 La. 400, 199 So. 228; Holliday v. Martin Veneer Co., La.App., 15 So.2d 168, affirmed 206 La. 897, 20 So.2d 173; Annen v. Standard Oil Co. of New Jersey, La.App., 28 So.2d 46; Daigle v. Higgins Industries, Inc., supra; Goodman v. Hillyer, Deutsch, Edwards, Inc., La.App., 49 So.2d 60; Malone’s Louisiana Workmen’s Compensation Law and Practice, Sec. 402.
In his comments, Professor Malone states:
“The method of computing the credit has not always been uniform. The court in the Hulo case undertook to divide the wages into earned and unearned portions, and based the credit on the total ‘unearned’ payments. Since the retained employee is usually given lighter duties at full wages, part of the wage is actually ‘earned’ and part ‘unearned’. The difficulty in making a fair determination of what a worker actually ‘earns’ is obvious, yet to disregard completely the worker’s productivity and to allow the employer full credit for rehabilitation wages might be regarded as unfair. However, the method accepted in the Hulo case of dividing the wage was not followed in succeeding cases, although lip service has been paid in allowing total credit for all wage payments.
“The case, Carlino v. U. S. Fidelity & Guaranty Company, decided seventeen years after the Hulo case, placed the employer’s credit on an entirely new basis. The suit was against the employer’s insurer, who claimed credit for the total wages paid by the employer. The supreme court held that *267 an insurer cannot have ‘credit for excess payments made by the employer to employee as a gratuity.’ The payments merely take the place of the compensation which accrued to the worker during the same period in which wage payments were made.
“Ability to earn played no part in the Carlino decision. Instead of apportioning the wage payments on an earned and unearned basis, the court allowed the defendant a flat deduction of a week’s compensation for every week wage payments equalled or exceeded the compensation rate. Although the court in the Carlino case was dealing with the employer’s insurer, the same rule has been applied to the employer.
* * * * * *
“The effect of the Carlino case was fully discussed later by the court of appeal in Annen v. Standard Oil Company of New Jersey. The defendant sought to return to the Hulo rule, and asked for credit for the total amount of unearned wages paid the claimant. The court noted that it would be inequitable to charge the employer with compensation in addition to the prior wages, but on the other hand it would be inequitable to treat all such wages as ‘advance compensation’. Yet the court expressed itself as being opposed to a separation of earned from unearned wages. The easy rule of the Carlino case furnished a rough compromise. Later, in the case of Daigle v. Higgins Industries, the court held that the employer is entitled to credit even though the prior wages had been fully earned. Since the Daigle case, the method for computing the credit described above has been consistently applied without modification.”
The conclusion necessarily follows that defendant herein is entitled only to credit for the period of time for which full wages were paid, that is, for 21 weeks, and not credit for such length of time as compensation at plaintiff’s rate would equal the total wages paid during the 21 weeks.
Before concluding this opinion, it should be noted that defendant strenuously contends that plaintiff’s failure to obtain the testimony of a fellow employee, William Mecom, with whom plaintiff claims he was working at the instant of the accident and to whom he allegedly complained immediately of his injury, constitutes a presumption that Mecom would not have, had he testified, corroborated plaintiff’s statements. We are not of the opinion, from our appreciation of the matter, that plaintiff’s failure to obtain the testimony of this witness is entitled to the importance contended. In the first place, Mecom was a former employee of defendant, and, although the testimony reveals that at the time of trial he was somewhere in Texas, the defendant was in a much better position to locate the witness and obtain his testimony. Plaintiff was a common laborer and his suit was prosecuted in forma pauperis.
For these reasons, the judgment appealed should be, and it is, therefore, amended by increasing the period of payment of compensation from a term of 300 weeks to the period of plaintiff’s disability as of total, permanent disability, not, however, exceeding 4.00 weeks, subject to a credit only of compensation previously paid covering a period of 21 weeks, and, as thus amended, the judgment is affirmed.
Amended and affirmed.